IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION


JUSTIN AARON VILLARREAL                                        PLAINTIFF


v.                          Civil No. 4:23-cv-04099-JTS-SGS


SERGEANT JOSHUA WATSON; and
SERGEANT JAIMOND JOHNSON                                      DEFENDANTS


### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This is a civil rights action originally filed *pro* se by Plaintiff, Justin Aaron Villarreal, under

42 U.S.C. § 1983.  Plaintiff was appointed counsel on September 19, 2025 to represent him in this

matter.  (ECF No. 69).  Currently before the Court is Defendants' Motion for Summary Judgment.

(ECF No. 73).  Plaintiff responded.  (ECF No. 80).  Pursuant to the provisions of 28 U.S.C. §

636(b)(1) and (3) (2011) the Honorable Susan O. Hickey, United States District Judge, referred

this case to the undersigned for the purpose of making a Report and Recommendation.[1]  The Court

finds the matter ripe for consideration and recommendation.

As an initial matter, Plaintiff clarifies, in his Response, that he is only pursuing the claim

of excessive force against Defendants in their individual capacities.  Therefore, the Court will not

enumerate Plaintiff's additional claims made in his Complaint or address facts and arguments

asserted by Defendants in their Motion related to any additional claims.  (ECF No. 80, p. 1).  The

Court considers Plaintiff's Response to voluntarily dismiss all such claims.

---

[1] Effective April 29, 2026, this matter has been reassigned to the Honorable John Thomas
Shepherd, United States District Judge.

1

## I.  FACTUAL BACKGROUND

At all times relevant, Plaintiff was incarcerated in the Southwest Arkansas Community Corrections Center in Texarkana, Arkansas (hereinafter "SWACC") as a convicted inmate.[2]  (ECF No. 1, p. 2).  Defendants were both employed as officers at SWACC, during this time, which is operated by the Arkansas Division of Corrections.  (ECF No. 73-1, p. 1).

The parties' versions of events vary widely on this summary judgment record.  The Court will enumerate all material facts below with indications as to relevant disputes when necessary.

In his Complaint, Plaintiff alleges Defendants used excessive force against him on July 3, 2023.  (ECF No. 1, p. 4).  Specifically, Plaintiff states:

> On July 3rd 2023 at approx.. 11:15 pm Joshua Watson and Jiamond Johnson approached me in the dayroom on 4th floor they told me to go to my room, room 436.  I did in the room Jaimond Johnson was talking to me while Joshua Watson was behind me.  As I was speaking to Jaimond Johnson Joshua Watson began punching me.  Jaimond Johnson put a handcuff on my left wrist and pulled my arm back he grabbed my other arm and held me in a restraint while Joshua Watson continued to punch me.  I was placed on the ground and then the handcuff was put on my right wrist.  I was then escorted to Intake 104 afterward so I had an black eye and bloody nose and a busted lip.  I also had a migraine that lasted six days.  I was knocked unconscious.

(ECF No. 1, pp. 4-5) (errors in original).

It is undisputed that on the night of July 3, 2023, nonparty Cathy Barden, a corporal at SWACC, oversaw monitoring the fourth-floor residents, one of which was Plaintiff.  (ECF Nos. 73-1, pp. 1-2; 81, p. 2).  Plaintiff was housed in room 431.  *Id.*  Room 431 was the designated "noncompliance" room for the fourth floor of SWACC.  *Id.*  Noncompliance is the status given to residents when they break rules of the facility, or their assignment after a term in solitary confinement but prior to their release to the general population.  (ECF Nos. 73-1, pp. 2; 73-3, p.

---

[2] Plaintiff is currently incarcerated in the Harris County Jail in Houston, Texas.  (ECF No. 81, p. 1).

11; 81, p. 2).  During a noncompliance assignment, a resident is required to stay in their room and may only leave their room for work or a class.  *Id.*  Plaintiff was housed in room 431 alone during the time in issue.  (ECF Nos. 73-1, p. 2; 73-3, p. 18; 81, p. 2).

Corporal Barden testifies in her Declaration that when she arrived for her shift on July 3, 2023, the officer she was relieving informed her that Plaintiff was impermissibly leaving his room during that officer's shift.  (ECF No. 73-1, p. 2).  Plaintiff disputes this fact as he testified in his deposition that nonparty Mr. Franklin removed him from noncompliance status earlier that same day.  (ECF No. 73-3, p. 15).  Plaintiff does admit it is correct that he was in the day room watching television when Corporal Barden arrived on the fourth floor.  (ECF Nos. 73-1, p. 2; 81, p. 3).  If, still on noncompliance, Plaintiff was required to remain at least three squares inside his room, meaning at least three floor tiles inside the room.  (ECF No. 73-1, p. 2).

It is also undisputed that Corporal Barden confronted Plaintiff when she arrived on the floor, and Plaintiff explained to her that Mr. Franklin had released him from noncompliance.  (ECF Nos. 73-1, p. 3; 81, p. 3).  Mr. Franklin is a member of the staff over discipline at SWACC.  (ECF No. 73-1, p. 3; 81, p. 3).  Corporal Barden testified, and Plaintiff does not dispute, that there was no paperwork to prove Mr. Franklin removed Plaintiff from noncompliance status and Plaintiff was still listed on the noncompliance marker board on the floor.  (ECF No. 73-1, p. 3, 81, p. 3).

Corporal Barden then testifies she asked Plaintiff to return to his room several times.  According to Corporal Barden, Plaintiff approached his doorway but did not enter it.  Instead, Plaintiff began cussing and acting aggressively. (ECF Nos. 73-1, p. 3).  Plaintiff disputes Corporal Barden's rendition of this interaction.  Plaintiff points to the witness statements of Wayne Honeycutt and David Berry which both state Plaintiff did enter his room.  (ECF Nos. 73-11; 73-12).  Plaintiff also states he went into his room in his verified Complaint.  (ECF No. 1, p. 4).

3

Plaintiff also disputes that he initiated the cursing between himself and Corporal Barden again citing the witness statement of David Berry which states: "they had more words which escalated . . . ." (ECF No. 73-12).[3]

It is undisputed that Corporal Barden then called Defendant Johnson to help her with Plaintiff. Defendant Johnson arrived on scene with Defendant Watson. (ECF No. 73-1, p. 3). Plaintiff does not dispute that he participated in cursing and yelling with Defendants once they arrived, but disputes that he called anyone a racial slur. (ECF Nos. 73-1, p. 3; 73-3, pp. 8, 20). Plaintiff also testified he showed Defendant the paperwork indicating he was released from noncompliance status. (ECF No. 73-3, p. 23).

Defendant Watson testified in his Declaration that once he and Defendant Johnson arrived on the fourth floor:

> [Plaintiff] was given three orders to return to his room and he went to the doorway before he began yelling and cussing at staff. At this time [Defendant] Johnson gave [Plaintiff] four verbal orders to stop yelling at staff and get 3 squares back into his room."

(ECF No. 73-2, p. 2). Plaintiff disputes Defendant Watson's testimony. Specifically, Plaintiff alleges he was inside his room either in his bed or climbing into his bed by the time the altercation between himself and Defendants began. (ECF No. 73-3, pp. 8, 21-22).

Corporal Barden testified that both Defendants Watson and Johnson told Plaintiff to "cuff up" but he refused to submit to hand restraints. Plaintiff appeared to stiffen up and would not allow the Defendants to handcuff him. One of the Defendants was then able to get one wrist cuffed, but Plaintiff jerked back and took the handcuffs. At this point Corporal Barden called for

---

[3] Plaintiff also cited his Complaint for his dispute regarding the cussing; however, the Court does not read any statements about cussing in Plaintiff's Claim One on excessive force. (ECF No. 1, pp. 4-5).

back-up because Plaintiff is a "big, tall man and [she] was worried about the safety of the [Defendants]." (ECF No. 73-1, p.3). Plaintiff disputes that he was ordered to "cuff up." (ECF No. 73-3, p. 22-23). Specifically, Plaintiff testified that if Defendants ordered him to cuff up, he would have put the cuffs on to keep himself out of trouble. *Id.*

Defendant Watson's testimony does not include any reference to Plaintiff stiffening up to avoid the cuffs as Corporal Barden's does, but he does state additional details as follows:

> [Plaintiff] ignored all orders to enter his room. Therefore, I placed his left hand in hand restraints. Before I could secure his right hand, [Plaintiff] pulled away and took the restraints away from me. [Defendant] Johnson and I attempted to place [Plaintiff on the floor but [Plaintiff elbowed [Defendant] Johnson in the eye and broke his glasses. [Plaintiff then struck me in the head several times with a closed fist. In order to regain control, I delivered four strikes to his brachial plexus origin.
>
> After I delivered blows to the brachial plexus origin, [Plaintiff] kicked and kneed me in my left thigh until we were finally able to restrain him with the help of Cpl. Zachary Mauldin, Cpl. Tara Clements, and CO1 William Wilson.[4]

(ECF No. 73-2, p. 3). Plaintiff denies that he resisted or hit, kicked, or kneed either Defendant. (ECF Nos. 73-3, p. 8-; 81, p. 5).

Corporal Barden testified that the officers "mostly" tried to grab Plaintiff's arms and torso when trying to restrain him, but it was difficult to get Plaintiff to the floor because he was inside his room with his back against the bed. Additionally, Corporal Barden testified that no officer punched Plaintiff in his face. (ECF No. 73-1, pp. 3-4). Plaintiff disputes Corporal Barden's terminology of "mostly." Further, Plaintiff disputes Corporal Barden's testimony regarding the punching. Plaintiff testified in his deposition that he was punched ten times, and both Defendants punched him in the face. (ECF No. 73-3, p. 44, 29). Finally, Corporal Barden testified that

---

[4] It is undisputed that the brachial plexus origin is the collarbone area between the neck and shoulder and that Defendant Watson was trained to strike this area if needed to gain compliance of an inmate. (ECF Nos. 73-2, p. 3; 81, p. 5).

Plaintiff was the aggressor in the incident on July 3, 2026, and that she did not witness either Defendant do anything improper during the incident. (ECF No. 73-1, p. 4). Plaintiff disputes this testimony. (ECF No. 81, p. 6).

It is undisputed that Defendants, along with the other officers that were called for back-up, were eventually able to restrain Plaintiff when nonparty Corporal Mauldin grabbed his leg and took him to the ground. (ECF Nos. 73-1, p. 3; 81, p. 3).

In his deposition Plaintiff testified his version of events:

**Q . . . Why did you file this lawsuit?**
. . .
A. Well, . . . July 3ʳᵈ . . . the staff over discipline, SOD Mr. James Franklin, . . .I was placed on noncompliance a couple of weeks before, and for the Fourth of July he took me off, done all the paperwork . . ..

Well, I had went back to the floor. I presented the paperwork to the officer beforehand, I can't remember his name exactly. . . .they didn't do a room change, which is normally what they would do . . .

So around 11:25 or so, [Defendant] Joshua Watson and [Defendant] Jiamond Johnson had approached me in the day room on the fourth floor, right, and I was watching TV. They was, like, hey, you're on – or we're placing you, this is exactly what they said: We're placing you on noncompliance. I said Mr. Franklin took me off today. He said something about . . . Corporal Barden, didn't feel comfortable with you being on the floor for off of noncompliance if you didn't go through the correct procedures as everybody else did. I told him, well, y'all aren't SOD, you know, so how can you just sanction me that sanction that SOD didn't sanction me with, right?

He's like well, you can either go to your room right now or you can go to the hole. I was like oh, I'll go ahead and go the room . . . I was standing there by my bed, and they came back in there. They're like, don't come out anymore for the rest of the night, don't come out tomorrow . . . That's when I showed him the paperwork because I was given it back. They're like, we don't care about this. We're going to talk to Mr. Franklin . . . so I said, all right, cool. . . .

I'm surprised y'all don't have the video of them exiting the room and then coming back again . . . I don't remember exactly what all was said in this process. I know for a fact they started to get mad over something, and I'm just kind of like I have no control over this, you know. I think they were saying something along the lines

it isn't right that SOD just does whatever without following the procedures, or something like that.

Well, in this process I did say some cuss words. . . Both parties were cussing and getting mad, and at that point I just said man, fuck it, I'm going to bed.

As I was climbing up in my bed, Watson was like, where do you think you're going? You know, just kind of like I'm through talking about this, right?  At this point there's a crowd of people just at the door.  Corporal Barden, a bunch of other people, like residents and stuff and Watson, I guess that was the last point for him, the final straw, I don't know.  He seems to really have bad anger problems anyways, so as I turn, dude, boom, hits me.

**Q. This is Watson, you're saying?**

A.  Yeah.  So I turned around kind of like what the, you know?  Then Johnson grabbed me, right, and Watson continued to hit, right?  So I'm just like, this is crazy. So Ms. Barden called, I guess, the use of force or whatever, and Mauldin came in, Montiel came, Clements came in, Wilson came in, and a couple of other people . . . I wasn't fighting back or none of that stuff.

(ECF No. 73-3, pp. 6-9).

Defendant Watson testified in his Declaration:

At no point did I use any force that was disproportionate to what the situation called for.  I only deployed enough force to gain control over [Plaintiff].  I had no previous personal disputes with [Plaintiff].  I had no desire to cause him any type of harm. [Defendant] Johnson did not strike [Plaintiff's] face during this incident.  I never used excessive force against [Plaintiff].  I have never used physical force to retaliate against [Plaintiff] for any past behavior.

(ECF No. 73-2, p. 3).  To the contrary, Plaintiff testified that he and Defendant Watson had previously dated the same woman at different times so there was "no love loss" between them. (ECF No. 73-3, p. 23).

It is undisputed that after the incident Plaintiff was taken to Intake Cell 104 and seen by medical personnel.  Plaintiff's medical record note he had abrasions to his right eyebrow and underneath his right eyeball.  Additionally, Plaintiff's right wrist was slightly swollen with no bruising or discoloration.  Plaintiff was given an ice pack.  (ECF Nos. 73-4, p. 3; 81, p. 6).  Plaintiff

also fell off his bed on the morning of July 3, 2023 (prior to the use of force incident) and was seen by medical personnel.  During that visit it was noted Plaintiff suffered superficial wounds to his right forehead and right check.  (ECF Nos. 73-5, p. 3; 81, p. 7).

In connection with the use of force incident on July 3, 2023, Plaintiff was charged with a Cardinal Rule violation.  (ECF No. 73-7).

Defendant Johnson completed a signed statement on July 3, 2023 describing the use of force incident which is consistent with Defendant Watson's Declaration testimony.  (ECF No. 73-4, p. 1).  However, Defendant Johnson did not submit a declaration or any other sworn testimony on this summary judgment record.

The summary judgment record also includes signed statements from: (1) Plaintiff; (2) the other nonparty officers that participated in the incident; and (3) other inmates who witnessed portions of the incident.  Plaintiff did not dispute any of these witness statements.  (ECF No. 81, pp. 8-10).  Those statements that the Court finds material are included herein.

Plaintiff completed his Incident Statement on July 3, 2026 at 2300 hours:

> Sgt Johnson & Sgt Watson were talking to me in my room.  I had my hands in my pockets talking to Sgt. Johnson.  Sgt. Watson then assaulted me twice I then started defending myself.  Sgt. Johnson told Sgt. Watson to quit but he didn't.  Sgt Watson grabbed my middle area (testicles).  I hit him again out of self-defense.  Then Mauldin, Montiel and Clements came in.  Sgt. Watson was separated and I let them put me in cuffs.  I was taken to the hole.  I have sustained injuries and want to file assault charges PREA and a restraining order on Sgt. Watson.

(ECF No. 73-6) (cleaned up).

Corporals Mauldin, Clements, and Wilson's statements all indicate they were called in to assist but the incident was already in progress when they arrived.  They all state they helped Defendants get Plaintiff cuffed and on the ground.  There is no mention of any party punching,

hitting, or kneeing at any other party in any of the officers' statements.  (ECF Nos. 73-8; 73-9; 73-10).

Fellow inmate, Wayne Honeycutt, wrote the following statement on July 3, 2023 at 11:30 p.m.:

> I Honeycutt was in the dayroom when Villarreal was asked to go back to his room. Villarreal did not want to go back.  After being asked more than two or three times and after the CO said, go back to your room or go to the hole he went to his room. After he went to his room I didn't see what happened in the room of 431.  All I saw was about 5 or 6 CO's go in the room and took Villarreal out.

(ECF No. 73-11) (cleaned up).

Fellow inmate, David Berry, wrote the following statement on July 3, 2023 at 11:20 p.m.:

> On the above date and time, while watching TV in the day room Villarreal was asked to return to the noncompliance room and he refused saying he was no longer on noncompliance but they had no movement or release sheet so he went to the room where they had more words which escalated to them asking him if he wanted to go to the hole and to cuff up then they went into a commotion and other officers arrived and he was lead out of the floor.

(ECF No. 73-12) (errors in original).

Fellow inmate, Moises Robles, wrote the following statement on July 3, 2023 at 11:15 p.m.:

> I was on my bed after the 11:00 pm count and I heard yelling so I got out of my bed and walked to the gray and was hearing Ms. Barton telling Villarreal to let go of him and to stop.

(ECF No. 73-13) (errors in original).

Fellow inmate, Roberto Ugalde, wrote the following statement on July 3, 2023 at 11:15 p.m.:

> Villarreal was having a verbal dispute with Sgt. Johnson, Ms. Barten and another C.O. over his status of non-compliance Villarreal insisted he was off non-compliance and the C.O.s said there was no paperwork or evidence of his release from non-compliance.  The C.O.s directed Villarreal to return to this room which eventually he did.  Villarreal continued to argue his case from his doorway.  Sgt.

Johnson warned Villarreal that if he continued to be disrespectful he'd be going to the hole. Sgt. Johnson then told Villarreal to cuff up. From there I only heard arguments as they were inside room 431. After a few minutes I heard the sounds of a physical scuffle. At one point Villarreal exclaimed "You're gonna hit me" and "on my momma" and "come in here." More C.O.s then appeared and took Villarreal off the floor.

(ECF No. 73-14) (errors in original).[5]

The video footage submitted on this summary judgment record is not of the incident in question. Instead, it is Plaintiff being escorted through the intake area of SWACC after the incident occurred. (ECF No. 73-3, pp. 47-52). The video is 17 seconds long and offers no evidence of the use of force itself. However, the video does show that Plaintiff is not resisting and is walking willingly with the officers. Further, Plaintiff's face does not appear bloody, and there is no blood on his shirt.

The Plaintiff testified in his deposition that he was unsure why the video from the day room outside his room was not produced. *Id.* at 47-48. Defendants offer no explanation for this in their briefing.

## II.  LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine

---

[5] Fellow inmate, Martinez, also wrote a statement but it started with "I did not see anything." Martinez did describe what he heard but he also does not identify any offices by name in his statement. (ECF No. 73-15). The Court does not find this statement adds any new information to the summary judgment record.

issue of material fact exists." *Nat'l Bank of Comm. v. Dow Chem. Co*., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607. "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id*. at 610. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.  DISCUSSION

In their Motion, Defendants argue they are entitled to qualified immunity against Plaintiff's excessive force claim.  (ECF No. 75).  Specifically, Defendants assert Plaintiff cannot establish any of the elements of excessive force—unnecessary, excessive or cruel, or that Defendants "delighted" in using the force.  Defendants rely on Plaintiff's inconsistencies in his Complaint, incident statement, and deposition in support of this argument.  Defendants argue they have met their summary judgment burden, but Plaintiff has failed to meet proof with proof.  Finally, Defendants argue the only reliable account of the force used was offered by Defendant Watson and that account shows the force was justified as a good faith effort to maintain or restore discipline. *Id.*

In his Response, Plaintiff argues Defendants mischaracterize his statements as starkly different and mischaracterize the other witness statements as consistent.  (ECF No. 80).  Moreover, Plaintiff argues without video evidence of the use of force, an inmate's allegations or testimony

11

that contradicts a guard's statement creates genuine issues of material fact precluding summary judgment.  Finally, Plaintiff argues that Defendants are not entitled to qualified immunity because it is well settled that repeatedly striking a fully restrained inmate violates the Eighth Amendment. *Id.*

As an initial matter, the Court finds there are genuine issues of material facts on this summary judgment record as is obvious from the factual section above: (1) whether Plaintiff was in fact released from noncompliance and showed the papers proving such release to Defendants; (2) whether Plaintiff eventually complied with the Defendants orders and returned to his room; (3) whether Plaintiff was resisting and refusing orders when the first use of force occurred; (4) whether the use of force was four hits to the brachial plexus origin or ten punches to the face; (5) whether Defendants followed Plaintiff into his room escalating the interaction after Plaintiff complied with the order to return to his room; and (6) whether Plaintiff's injuries were caused by the use of force.

While Defendants argue that the only reliable description of the use of force is from Defendants, they have claimed qualified immunity.  Such an analysis on summary judgment requires the Court to view any factual disputes in the light most favorable to the Plaintiff.  *See Nance v. Sammis,* 586 F.3d 604, 609 (8th Cir. 2009).  Plaintiff's version of events is not blatantly contradicted by the record here.  *Cf. Scott v. Harris*, 550 U.S. 372, 380 (2007) (a video on the record blatantly contradicted the plaintiff's version of events).  Furthermore, the Court will not weigh Plaintiff's credibility against Defendants' credibility on summary judgment.  *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000) (explaining the court must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence as those are jury functions).  Accordingly, the Court will

proceed in analyzing Defendants' claim of qualified immunity using the undisputed facts enumerated above along with those facts as alleged or testified to by Plaintiff.

**Qualified Immunity**

Qualified immunity "shields [a] government official[] from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986). "At summary judgment, qualified immunity shields a law enforcement officer from liability in a § 1983 action unless: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Watson v. Boyd,* 2 F.4th 1106, 1109 (8th Cir. 2021) (internal citation and quotations omitted). The Court may use its discretion in determining which of these two prongs to address first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). If a constitutional right was not clearly established at the time of deprivation, then the Court need not determine whether the particular plaintiff's constitutional rights were violated based on the facts before it because the defendant is entitled to qualified immunity regardless. *See Dimock, v. City of Brooklyn, et. al,* 124 F.4th 544, (8th Cir. 2024).

For this analysis, the Court looks to the law at the time of the incident in July 2023. The Supreme Court has cautioned that "clearly established law should not be defined at a high level of generality." *White v. Pauly*, 580 U.S. 73, 79 (2017) (internal citation and quotation omitted). A right is clearly established if it is sufficiently clear for every reasonable official to understand the actions would violate a constitutional right. *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)

13

(internal quotations omitted).  The case precedent must not be directly on point, but it must place the constitutional question beyond debate.  *White*, 580 U.S. at 79 (internal citation and quotation omitted).  The Eighth Circuit recently expounded on this standard by explaining "[a] clearly established right is dictated either by controlling authority or a robust consensus of cases of persuasive authority."  *Dimock*, 124 F.4th at 550 (internal quotations and citations omitted).  The *Dimcok* Court went on to explain the legal principle must "clearly prohibit the officer's conduct in the particular circumstances before him."  *Id*.

When analyzing qualified immunity on summary judgment the Court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor.  *Nance,* 586 F.3d at 609.

### Use of Force – Eighth Amendment Violation

Defendants do not deny they used force against Plaintiff on July 3, 2023.  Instead, Defendants argue the force used does not qualify as excessive because Defendants did not apply such force maliciously or sadistically to cause harm.  (ECF No. 75, pp. 5-6).

"After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment."  *Burns v. Eaton*, 752 F.3d 1136, 1138 (8th Cir. 2014) (quoting *Whitley v. Albers,* 475 U.S. 312, 319 (1986)).  In evaluating an excessive force claim under the Eighth Amendment, the relevant inquiry is whether the force used was applied in a good-faith effort to maintain or restore discipline or was used to maliciously and sadistically to cause harm.  *See U.S. v. Miller*, 477 F.3d 644, 647 (8th Cir. 2007).  The infliction of pain during a prison security measure does not amount to cruel and usual punishment simply because it may appear, in hindsight, that the degree of force applied for security purposes was unreasonable or unnecessary in the strict sense.  *Burns,* 752 F.3d at 1138-9 (8th Cir. 2014).  This

14

standard is different and less protective than the standard applied to arrestees or pretrial detainees under the Fourth Amendment.  The Fourth Amendment standard does not consider the officer's underlying intent, "whereas the subjective motivations of the individual officers are of central importance in deciding whether force was used maliciously and sadistically to cause harm in violation of the Eighth Amendment."  *Id.* at 1139 (internal quotations and citations omitted).

In determining whether a prison guard acted maliciously and sadistically the Court may consider factors such as: (1) "whether there was an objective need for force;" (2) "the relationship between any such need and the amount of force used;" (3) "the threat reasonably perceived by the correctional officers;" (4) "any efforts by the officers to temper the severity of their forceful response;" and (5) "the extent of the inmate's injury."  *Ward v. Smith*, 844 F.3d 717, 721-22 (8th Cir. 2016) (citations omitted).

### 1.  An objective need for force

There are clearly issues of fact regarding the events leading up to the Defendants' use of force here, namely: (1) whether Plaintiff followed the orders to go back inside his room; (2) whether Plaintiff was acting aggressively towards the officers (nonparties or Defendants); (3) whether Plaintiff was given and followed orders to "cuff up;" and (4) whether plaintiff punched, hit, or kneed Defendant Watson.

The facts as alleged by Plaintiff show he eventually followed orders and went back to his room where he was getting in the bed when Defendants followed him and escalated the altercation into physical force.  (ECF No. 73-3, pp. 6-9).

While the Court disagrees with Defendants' characterization of Plaintiff's statements being widely inconsistent, it does recognize the credibility issues in some inconsistencies presented by

Plaintiff.  However, his claims are not blatantly contradicted by the record here.  *Cf. Scott v. Harris*, 550 U.S. 372, 380 (2007) (a video on the record blatantly contradicted the plaintiff's version of events).  Here, there is no video evidence of the use of force,[6] and a jury may choses to believe Plaintiff's claims and testimony over the contradicting evidence.  At this stage, it is not the Court's role to weigh evidence or determine credibility.  *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000) (explaining the court must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence as those are jury functions).

An appropriate use of force to regain control over a recalcitrant inmate that is intentionally disobeying orders, using profanity, or threatening officers is objectively reasonable.  *See Jones v. Shields,* 207 F.3d 491, 496 (8th Cir. 2000).  However, a use of force on an inmate who initially disobeyed an order but was complying before the force is exercised is not objectively reasonable. *See Fisherman v. Launderville,* 100 F.4th 978, 981 (8th Cir. 2024) (a guard who kneed and kicked an inmate while fully handcuffed and kneeling on the floor of his cell was not entitled to qualified immunity even though the inmate had a history of threatening staff, was housed in the unit's most restrictive unit, was being transferred for a security violation, and initially refused a strip search); *see also Estate of Davis by Ostenfeld v. Delo,* 115 F.3d 1388, 1394-5 (8th Cir. 1997) (a guard who punched an inmate multiple times while other guards held the inmates limbs even though the inmate had stopped resisting orders was denied qualified immunity).

---

[6] The Court recognizes the video produced showing Plaintiff walking for 17 seconds after the incident occurred, but this evidence does nothing to dispel the contradictory testimony from Plaintiff, Defendant Watson, and the witnesses.

Considering the facts in the light most favorable to Plaintiff, as it must at this stage, the Court concludes a jury may find the Defendants' use of force was completely unnecessary as Plaintiff was already complying with the order and going to bed. *Id.*

### 2. Relationship between the need for force and amount used

As with the need for force, there are genuine material issues of fact as to the amount of force used, specifically: (1) whether Defendant Watson punched Plaintiff ten times in the head or only hit him four times in the brachial plexus origin; and (2) whether Defendant Johnon held Plaintiff's arms behind him in restraint while Defendant Watson hit him. Taking Plaintiff's version of the facts that he was in his room, and getting in his bed, when Defendant Watson struck him for the first time, a jury may likely find there was no need for force. Plaintiff had complied with the order to return to his room prior to any use of force, thus rendering any use of force after the fact maliciously applied. *See Fisherman,* 100 F.4th at 981 (citing *Dean v. Jones,* 984 F.3d 295, 310 (4th Cir. 2021) ("[A] correctional officer uses excessive force if he maliciously uses force against an inmate who has been subdued, even if force might have been justified to control the inmate only moments before.")); *see also Estate of Davis,* 115 F.3d at 1394-5.

### 3. The threat reasonably perceived

It is well established that an inmate's refusal to lock down in his cell poses a risk to the security of the SWACCC facility as a whole and may warrant the use of force to secure the inmate and restore discipline to the facility. *See Burns*, 752 F.3d at 1139 (the Eighth Circuit found an inmate's refusal of a direct order to "catch the cuffs" and return to his cell from the shower posed a threat and the ordering officer's use of pepper spray to restore discipline did not violate the inmate's Eighth Amendment rights). There is also testimony on the summary judgment record

17

from Corporal Barden that Plaintiff is a big and tall man that is consistently on noncompliance for rule violations and misbehavior. (ECF No. 73-1, pp. 2-3). Finally, Plaintiff conceded in his deposition that he participated in the cursing and yelling with the Defendants and other officers and could be "wild" sometimes. (ECF No. 73-3, pp. 8, 24, 31).

However, this summary judgment evidence is in direct contradiction to Plaintiff's allegations and testimony that he eventually conceded and returned to his room for bed. (ECF Nos. 1, pp. 4-5; 73-3, p. 6-9). Additionally, multiple witnesses also wrote in their statements that Plaintiff returned to his room prior to any use of force. (ECF Nos. 73-11; 73-12; 73-14; 73-15). Taking the facts as alleged by Plaintiff, Defendants used force against him after he complied with the order to return to his room. As explained by the Eighth Circuit in *Fisherman,* it does not matter that an inmate was combative prior to the use of force if when the force was used the Plaintiff was subdued. *See Fisherman,* 100 F.4th at 981; *see also Estate of Davis,* 115 F.3d at 1394-5.

Accordingly, a jury may determine by the time the force was used, the threat had dissipated and would not be reasonable perceived.

### 4. Defendants' efforts to temper his response

The only evidence related to Defendants' efforts to temper their response is Defendant Watson's testimony in his Declaration:

> I have never used excessive force against an inmate. I have only ever used the least amount of force necessary for compliance, when the situation calls for it and in accordance with training from ADC . . . At no point did I use any force that was disproportionate to what the situation called for. I only deployed enough force to gain control of Mr. Villarreal . . . I had no desire to cause him any type of harm.

(ECF No. 73-2, p. 1, 3).

18

However, as explained, Plaintiff alleges Defendants followed him into his room and escalated the interaction rather than tempering their response. (ECF No. 73-3, pp. 6-9). The inmate witness statements also support this version of events as well. (ECF Nos. 73-11; 73-12; 73-14; 73-15).

### 5. The extent of Plaintiff's injury

The extent of Plaintiff's injuries is the final factor the Court must consider. Here, Plaintiff claims injuries of loss of consciousness, a black eye, bloody noses, and facial abrasions, and a severe migraine for days. (ECF Nos. 1, p. 9; 73-3, p. 45). While the video evidence dispels the claim of a bloody nose (as noted above no blood is present immediately following the incident while Plaintiff is escorted to lockdown), *see Scott*, 550 U.S. at 380, there is summary judgment evidence, in Plaintiff's medical records, indicating Plaintiff had facial abrasions and complained of a migraine after the incident. (ECF Nos. 73-4, p. 3; 81, p. 6). The Court recognizes Defendants' theory that these abrasions were caused by Plaintiff's fall from his bunk earlier in the day on July 3, 2023, instead of the incident. However, this is yet another issue of fact for a jury to decide. It is not the Court's place, on summary judgment, to determine Plaintiff's credibility and whether his abrasions and headache were caused by the fall or by Defendants' fists. A jury may determine Plaintiff credible and find he was injured during the use of force incident with Defendants Watson and Johnson rather than the fall.

Furthermore, the minor nature of Plaintiff's injuries does not foreclose a claim of excessive force. *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) (explaining the extent of the plaintiff's injury is only one factor to consider in analyzing excessive force, and "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."). If those injuries claimed by Plaintiff are

found by a jury to have resulted from Defendants use of force, then he has satisfied the Eighth Amendment injury requirement.  *See Munz v. Michael,* 28 F.3d 795, 800 (plaintiff suffered soreness to his ribs or a rib contusion after guard beat him while restrained).

After considering all the factors, the Court finds, if a jury believes Plaintiff's version of events, it may find Defendants followed him into his room after he was, albeit begrudgingly, complying with their orders, to maliciously and sadistically restrain and beat him thus violating his Eighth Amendment right to be free from excessive force.  *See Estate of Davis by Ostenfeld v. Delo,* 115 F.3d 1388, 1394-5 (8th Cir. 1997); *see also Ward*, 844 F.3d 721-22.

### Clearly Established Right

As the Court finds a jury may determine Plaintiff's Eighth Amendment rights were violated through Defendants' use of force, it must next determine whether Plaintiff's rights to be free from excessive force in his particular circumstances were clearly established at the time the incident occurred.  *See Watson,* 2 F.4th at 1109.

Plaintiff argues that the law has been settled for at least three decades that repeatedly striking a fully restrained inmate violates the Eighth Amendment.  The Court agrees.  *See Fisherman v. Launderville,* 100 F.4th 978, 981 (8th Cir. 2024) (explaining the defendant guard was not entitled to qualified immunity because an inmate's right to be free from kneeing and hitting while handcuffed and kneeling on the floor of his cell was clearly established for at least three decades).  However, the facts alleged by Plaintiff here do not establish he was already handcuffed, as the plaintiff in *Fisherman*, when Defendant Watson repeatedly struck him.  Instead, Plaintiff claims Defendant Watson hit him while he talking to Defendant Johnson in his room, and while Defendant Johson "restrained" his arms behind his back.  However, all of this occurred before

20

Plaintiff was taken to the floor and handcuffed. (ECF No. 1, pp. 4-5). Given these facts, as alleged by Plaintiff, the Court finds *Fisherman* distinguishable from the instant circumstances for the purpose of determining "clearly established" rights for qualified immunity purposes. Plaintiff does not make any allegations that he was hit after being fully handcuffed. (ECF Nos. 1; 73-3; 73-6).

While the case law must not be directly on point, it must place the constitutional question beyond debate. *White*, 580 U.S. at 79. The *Fisherman* case discusses and reiterates that beating a handcuffed inmate violates said inmate's Eighth Amendment rights against cruel and unusual punishment, but it does not address facts similar to the instant case where the inmate was not yet handcuffed but was otherwise restrained by additional guards. However, the Eighth Circuit has previously addressed analogous circumstances more consistent with the ones presented here. In *Estate of Davis by Ostenfeld v. Delo*, the Eighth Circuit affirmed the district court's finding of excessive force and determined the law was clearly established in October 1992 that striking an unresisting inmate 20-25 times in the head, while four other officers were restraining his limbs was a violation of the inmate's Eighth Amendment rights against cruel and unusual punishment. 115 F.3d 1388, 1394-5 (8th Cir. 1997). The *Davis* Court went on to explain it was also clearly established that those officers that restrained Mr. Davis's limbs during the beating violated his Eighth Amendment rights. *Id.* at 1395. While the inmate in *Davis* suffered more extreme injuries than Plaintiff here, the facts of the use of force are analogous. Mr. Davis initially refused orders to be handcuffed so that his cell could be searched. *Id.* at 1391-2. In response to this refusal a "movement team" was assembled and sent into Mr. Davis cell. *Id.* Upon the arrival of the movement team, Mr. Davis attempted to explain his refusal to cuff up but was immediately ordered to lie face down on the cell floor. Plaintiff complied and a guard lunged on top of Mr. Davis and

21

repeatedly struck him about the head and face. *Id.* at 1391-2. Four other guards held Mr. Davis's limbs while the beating occurred. *Id.*

Here, Plaintiff, like Mr. Davis, initially refused orders to return to his room but then complied. He returned to his room and was getting into bed when Defendant Watson entered his room and began punching him. (ECF No. 73-3, pp. 6-9). Then, Defendant Johnson restrained Plaintiff's arms behind his back so that Defendant Watson could continue to punch him. (ECF No. 1, pp. 4-5). The Court finds that every reasonable official would understand such actions by both Defendants violated Plaintiff's constitutional rights under the Eighth Amendment against excessive force. *See Mullenix*, 577 U.S. at 11.

In conclusion, considering the undisputed facts along with those disputed facts in the light most favorable to Plaintiff, the Court holds Defendants are not entitled to qualified immunity at this time, and summary judgment should be denied.

## IV. CONCLUSION

For the reasons stated above, I recommend the Defendants' Motion for Summary Judgment (ECF No. 73) be **DENIED.** However, Plaintiff's Claim Two for denial of medical care; Claim Three for falsifying documents; and all official capacity claims against both Defendants Watson and Johnson should be **DISMISSED WITHOUT PREJUDICE** as Plaintiff has stated in his Response (ECF No. 80) that he wishes to voluntarily dismiss such claims. This leaves for further litigation only Plaintiff's Claim One for excessive force against Defendants Watson and Johnson in their individual capacities only.

**Referral Status: The referral in this matter should be terminated.**

22

The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.

DATED this 1st day of May 2026.

/s/ *Spencer G. Singleton*
HON. SPENCER G. SINGLETON
UNITED STATES MAGISTRATE JUDGE